UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
DAVALL GARRISON,                                   :
                 Plaintiff,                   :
                               :
v.                                                 :        **<u>OPINION AND ORDER</u>**
                               :
AMERICAN SUGAR REFINING, INC.;                     :        21 CV 10917 (VB)
AMERICAN SUGAR HOLDINGS, INC.;                     :
ASR GROUP INTERNATIONAL, INC.; and                 :
DENNIS ANGONE,                                     :
                 Defendants.              :
--------------------------------------------------------------x

<u>Briccetti, J.</u>:

Plaintiff Davall Garrison brings this employment discrimination action against defendants American Sugar Refining, Inc., American Sugar Holdings, Inc., and ASR Group International, Inc. (collectively, "ASR"), and a former supervisor, Dennis Angone, alleging defendants (i) discriminated against him on the basis of his race and national origin, (ii) retaliated against him for complaining about such discrimination, (iii) created a hostile work environment, (iv) compensated him with unequal pay in comparison to his peers; and (v) aided and abetted his racial discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C § 1981; the New York State Human Rights Law ("NYSHRL"); and the New York Equal Pay Act ("NYEPA").

Now pending is defendant's motion for summary judgment. (Doc. #75).

For the reasons set forth below, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

**BACKGROUND**

The parties have submitted briefs, statements of material fact pursuant to Local Civil Rule 56.1, and declarations with exhibits. These submissions reflect the following factual background.

I.    Plaintiff's Employment

Plaintiff, an African American man, is currently employed by ASR as a Laboratory Tech 3 ("Lab Tech") at ASR's sugar refinery in Yonkers, New York. He was hired as a Lab Tech in 2010 and has remained in that position since.

Lab Techs work in the Quality Assurance Laboratory (the "Lab") at ASR and are responsible for performing quality tests on sugar samples, as well as preparing related paperwork. When plaintiff joined the Lab, Lab Techs worked alongside several other categories of Lab employees: Chemists, Microbiologists, a Quality Manager, and a Laboratory Supervisor ("Lab Supervisor"). The Lab Supervisor oversees the Lab Techs' work and is responsible for reviewing quality test results and documentation, but does not have the authority to make hiring, promotion, or termination decisions. The Quality Manager supervises all Lab employees and is responsible for making those personnel decisions.

At the time plaintiff became a Lab Tech, the Quality Manager was Dennis Angone, who is white. In addition to plaintiff, four other Lab Techs worked at the Lab: Tommy Chadwick, who is white; Gregory Johnson, who is Black and Jamaican; Kawsu Jabbi, who is Black and American of Gambian descent; and Deodat Gewan, who is Guyanese of Indian descent.

In 2013, Angone was demoted from Quality Manager to Lab Supervisor. Angone left his employment at ASR in 2021.

II.   <u>Alleged Hostile Work Environment</u>

There is evidence in the record that, during Angone's years supervising plaintiff, Angone made several racially insensitive remarks to plaintiff.  For example, plaintiff testified at his deposition that in one instance Angone complained to plaintiff and another employee, "I have so much work to do today I feel like a slave." (Doc. 78-1 at Tr. 198).  Plaintiff also testified that on another occasion Angone directed plaintiff and another African American employee to lift heavy objects and, when they complained, he asked, "[W]hat are you complaining about.  You know you people are strong." (Doc. #78-1 at Tr. 301).  After plaintiff challenged him, Angone corrected himself and said "[Y]ou guys are strong." (<u>Id</u>.).  Plaintiff also testified Angone once referred to Black Lives Matter protestors as "low lives." (<u>Id</u>. at 302).  And according to plaintiff, Angone criticized plaintiff's work to other employees, including calling plaintiff "lazy." (Doc. #78-1 at Tr. 79).  Jabbi also testified Angone called plaintiff "lazy." (Doc. #78-2 at Tr. 20-21).

Additionally, according to plaintiff, Angone acted with animosity toward plaintiff at the Lab, including by assigning plaintiff extra work, ignoring plaintiff when plaintiff spoke to him, and communicating with plaintiff by instructing other employees to pass along messages to plaintiff.  Plaintiff never complained about Angone's treatment of him to anyone at ASR.

III.   <u>Alleged Discrimination</u>

Since joining the Lab, plaintiff has been a member of the union covering Lab employees. The Lab Tech position is governed by the terms and conditions of each Collective Bargaining Agreement ("CBA") between ASR and the union.  The CBA sets forth the wages paid to Lab Techs and governs the assignment of overtime shifts, which is tied to Lab Techs' seniority but subject to the approval of the Quality Manager.

When negotiating the 2017 CBA, the union and ASR agreed to the creation of a Senior Laboratory Technician ("Senior Tech") position.  Under the CBA, Senior Techs are paid a higher hourly wage than Lab Techs.  In addition to being able to perform the tasks of a Lab Tech, the job description for the Senior Tech position requires that Senior Techs be able to perform instrument calibration, chemical titrations, and learn microbiological sampling and testing procedures.  But Senior Techs can perform those additional responsibilities only while working overtime shifts.

The CBA does not require ASR to employ a set number of Senior Techs, but the company hired three in the months after the position was created:  Gewan, Johnson, and Jabbi—the three most senior Lab Techs working at the time.  Although not expressly stated in the job description, Senior Techs manage sugar loss monitoring, which was performed by the Lab Supervisor or Quality Manager before the creation of the Senior Tech position.  Under the Environmental Protection Act, ASR is required to constantly monitor sugar levels for potential loss.  Employing three Senior Techs allowed for constant, scheduled monitoring.

Plaintiff was the next most senior Lab Tech at the time the Senior Tech position was created.  Plaintiff never completed training on the additional responsibilities handled by Senior Techs on overtime shifts.

In September 2017, Chad Baum, who is white, became Quality Manager.  A few months later, in early 2018, Baum observed that overtime costs for the Lab were "consistently high." (Doc. #79 at ¶ 8).  As a result, he "began to question the efficiency" of the Senior Tech role— specifically, the CBA-mandated requirement that Senior Techs perform instrument calibration and other advanced functions only on overtime.  (Id.).  He viewed this requirement as "nonsensical, inefficient, and non-economical."  (Id.).  In May 2018, Baum prepared a new job

description for the role eliminating the mandatory-overtime requirement and submitted the revised description to the union. In response, the union refused to consider a change to the role outside of the collective bargaining process, and indicated it was unwilling to agree to Baum's proposal regardless.

In the summer of 2018, Baum met with plaintiff and Angone to discuss plaintiff's potentially becoming a Senior Tech because Angone wanted Gewan to focus on a specific subset of Senior Tech responsibilities. However, Gewan did not agree to that change, so plaintiff remained a Lab Tech.

In May 2019, Gewan resigned from the Senior Tech role. Plaintiff emailed Angone and asked if the position was open, but Angone did not respond and avoided conversation with plaintiff for weeks. After plaintiff tried to follow up several times, Angone eventually told him that Angone was not filling the position and that plaintiff should raise the matter with Baum or the incoming Quality Manager who was scheduled to replace Baum. Plaintiff contacted both, but neither spoke to him about the Senior Tech position.

At some point in 2019, either Baum or Chris Vega—another ASR supervisor—instructed Angone to train plaintiff as a Senior Tech. Later that year, Baum told Angone that he was eliminating the third Senior Tech position, although the parties dispute whether he had the authority to do so. Instead of hiring another Senior Tech, ASR hired Joel Norwood, an African American, as a new Lab Tech. After Gewan's departure in May 2019, ASR never hired another Senior Tech, nor did it post an opening for a Senior Tech position.

Because ASR did not search for applicants to fill the third Senior Tech position, the Lab faced staffing concerns following Gewan's departure, as it needed to ensure continuous sugar loss monitoring, even with one fewer Senior Tech. Accordingly, Lab Techs stepped in to perform

Senior Tech responsibilities—specifically, sugar-loss monitoring—when necessary.  If a Lab

Tech was required to do so, the Lab Tech was paid the Senior Tech overtime rate for that work.

IV.    Alleged Retaliation

In July 2019, Angone instructed plaintiff to perform sugar-loss monitoring work on shifts

on which plaintiff was staffed but a Senior Tech was not—explaining that plaintiff was the

senior-most Lab Tech and therefore the work fell to him.  Angone stated that plaintiff would

receive the Senior Tech overtime rate for such work.  Plaintiff refused to perform the Senior Tech

work without a promotion to Senior Tech, as he believed that Angone's assignment demonstrated

the ongoing need for a third Senior Tech.

On August 26, 2019, plaintiff filed an internal ASR grievance (the "2019 Grievance")

claiming that the company had denied him a promotion to Senior Tech because of racial

discrimination, favoritism, and retaliation for plaintiff's role as a union steward for the Lab.

Prior to the 2019 Grievance, plaintiff had never complained to ASR of racial discrimination.

On August 28, 2019, ASR denied plaintiff's grievance on the grounds that "[t]he CBA

does not specify the number of positions in each job classification," meaning ASR "has a right to

allocate its resources as business needs dictate," and plaintiff had not been denied a promotion

because there was no "open" Senior Tech position.  (Doc. #78-14).  In a meeting to discuss the

grievance, ASR human resources ("HR") manager Camille Valentin informed plaintiff and his

union representative that the third Senior Tech role had been "abolished" because it was too

expensive for the company.  (Doc. #78-10 at Tr. 47).  Plaintiff told Valentin that the real reason

ASR did not promote him was because Angone was racist against African Americans, and

Angone consistently displayed racist behavior toward plaintiff and other African American employees.

In the winter of 2020, Wayne Forrester joined the Lab as the new Quality Manager, and Elizabeth Mendonca became the Plant Manager for the entire refinery.  Forrester is African American and Mendonca is white.

Upon starting his position, Forrester spoke with Baum and Angone about plaintiff, and both men stated that plaintiff was not "promotable" because he "lacked the intellectual capacity to do" the Senior Tech work.  (Doc. #85-3 at ¶ 3).  Angone elaborated, saying "you can train Mr. Garrison to do a certain job and he will have forgotten everything in three weeks."  (Id.).

In March 2020, plaintiff, his union representative, and Forrester met to discuss plaintiff's requested promotion to Senior Tech.  Forrester said he "wanted to" promote plaintiff to Senior Tech, but he needed to speak with Mendonca and other ASR supervisors because it was "not his call" as Quality Manager.  (Doc. #78-10 at Tr. 28).  Throughout the next month, April 2020, plaintiff believed his promotion was "imminent" and therefore performed Senior Tech work on his shifts, for which he was paid the Senior Tech overtime rate.  (Doc. #85-2 ("Garrison Decl.") at ¶ 43).  Since then, plaintiff has performed sugar-loss monitoring work when no Senior Tech is staffed during his shifts.

In May 2020, Forrester informed plaintiff he would not be promoted.  Forrester told plaintiff that, according to HR Manager Valentin, "ASR would not, under any circumstances, promote" plaintiff.  (Garrison Decl. at ¶ 44).  At that time, Forrester had not discussed with Mendonca the possibility of creating or reviving the third Senior Tech position.  Later that month, Senior Tech Johnson informed plaintiff that Angone had asked Johnson to train two Lab Techs—both of whom were junior to plaintiff—to do Senior Tech work, thereby depriving

plaintiff of overtime pay that he otherwise would have received.  In the spring of 2020, ASR indeed trained all Lab Techs to perform Senior Tech tasks.

On May 28, 2020, plaintiff filed a second grievance (the "2020 Grievance") in which he alleged he was "still facing discrimination . . . by not being promoted to Senior Tech."  (Doc. #78-16).  He also claimed that ASR discriminated against him by training two more junior Lab Techs to do Senior Tech work.  Shortly thereafter, plaintiff met with Valentin, Angone, and another union representative to discuss his grievance.  In response to plaintiff's complaints, Angone said that plaintiff had refused a promotion to Senior Tech.  Plaintiff responded: "Refused the position? What have I been fighting this whole time for?"  (Garrison Decl. at ¶ 51). Observing the exchange, the union representative said "[Plaintiff] didn't refuse this job, we've had meetings before about this. . . .  This sounds like [it's] personal."  (Id.).  Valentin said she would "look into it further" and "get back" to plaintiff.  (Id. at ¶ 53).

ASR denied the 2020 Grievance because it raised "the same issue" as the 2019 Grievance.  (Doc. #78-17).  ASR also asserted the 2020 Grievance was "untimely" because "the time limits" on the 2019 Grievance had "expired."  (Id.).

Throughout the spring and summer of 2020, in meetings with Forrester and other ASR employees held to discuss contract negotiations with the union and plaintiff's grievance, Angone repeatedly voiced his opposition to promoting plaintiff to Senior Tech.

In August 2020, Forrester raised with Mendonca for the first time the possibility of creating a third Senior Tech role.  However, Forrester did not specifically discuss promoting plaintiff to that potential position.  On September 2, 2020, Mendonca met with Angone, Baum, and Forrester to discuss the subject, and Forrester advocated for creating a third Senior Tech position.  Baum told Mendonca he had started to phase out the Senior Tech role because its built-

in overtime requirements were not cost-efficient.  At the conclusion of the meeting, Mendonca

decided against creating a third Senior Tech role.  Neither Angone, Baum, nor Forrester raised

with Mendonca the possibility of promoting plaintiff to Senior Tech.  At the time she made this

decision, Mendonca was not aware of plaintiff's grievances or any informal complaints.

The status quo has continued since the 2020 Grievance:  two Senior Techs work at the

Lab, as well as several Lab Techs—the most senior of whom is plaintiff.  Lab Techs fill in when

needed to monitor sugar loss and, when they do so, they are paid overtime at the Senior Tech

hourly rate.[1]  From 2019 through March 2023, plaintiff, as the most senior Lab Tech, has worked

more overtime hours than any of his peers.

## DISCUSSION

I.    Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[2]

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

---

[1]    This is a recent change.  For most of the period in question, Lab Techs performing Senior Tech work were paid at the Senior Tech overtime rate.

[2]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  Bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

## II.   Race Discrimination Claims

Defendants argue plaintiff fails, as a matter of law, to establish a prima facie case of race discrimination under Title VII, Section 1981, or the NYSHRL because plaintiff cannot show that ASR's closure of the third Senior Tech position or its assignment of sugar-monitoring tasks to Lab Techs were discriminatory.

The Court agrees.

### A.   Legal Standard

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004); 42 U.S.C. 1981(a). Similarly, the NYSHRL prohibits discrimination against an employee based on that employee's "age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence." N.Y. Exec. Law § 296(1).

When, as here, a plaintiff's Title VII, Section 1981, and NYSHRL discrimination claims are based on circumstantial evidence of discriminatory intent, the claims are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Alvarado v. United Hospice, Inc., 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (collecting cases under all three statutes); see Porter v. Dartmouth-Hitchcock Med. Ctr., 92 F.4th 129, 149 (2d Cir. 2024) (explaining the McDonnell Douglas framework applies only in the absence of direct evidence).

Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of discrimination by demonstrating, by a preponderance of the evidence, "(i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination." Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998).

Once a plaintiff presents a prima facie case, the defendant then bears the burden of articulating a legitimate, non-discriminatory reason for the employment action. Weinstock v.

Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  If a defendant meets this burden, the plaintiff

must point to evidence that would be sufficient to permit a rational factfinder to conclude the

employer's explanation is merely a pretext for actual discrimination.  Tex. Dep't of Cmty. Affs. v.

Burdine, 450 U.S. 248, 254 (1981).

      B.     Assignment of Sugar-Loss Monitoring Tasks

          1.     Prima Facie Case

Plaintiff cannot make out a prima facie case of discrimination vis-à-vis the assignment of

sugar-loss monitoring to Lab Techs.  The key question here is whether the assignment of sugar-

loss monitoring tasks was an adverse employment action.[3]  It was not.

An adverse employment action involves some harm or injury to the employee's

conditions of employment.  Muldrow v. City of St. Louis, 601 U.S. 346, 359 (2024).  Examples

of adverse employment actions can include internal transfer, failure to promote, termination of

employment, demotion, "significantly diminished material responsibilities, or other indices . . .

unique to a particular situation."  Banks v. General Motors, LLC, 81 F.4th 242, 269 (2d Cir.

2023) (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)).  No "economic harm" is

"required" for an employment action to be adverse.  Id. at 270.  Nevertheless, a plaintiff must

show that he was "aggrieved" in some sense by the action in order for it to be considered

adverse.  Id.  In other words, "an 'adverse employment action' is one that is 'more disruptive

---

[3]     Plaintiff's argument that the Supreme Court's decision in Muldrow v. City of St. Louis,
601 U.S. 346, 359 (2024), removed the requirement of an adverse employment action from a
discrimination claim is a non-starter.  Muldrow did not remove the adverse employment action
requirement from the prima facie discrimination test.  Rather, it lowered the standard for proving
an adverse employment action by making clear that plaintiffs need not be significantly or
materially harmed in order to make such a showing.  Desiderio v. Hudson Tech. Inc., 2025 WL
1285278, at *11 (S.D.N.Y. May 2, 2025).

than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting Terry v. Ashcroft, 336 F.3d at 138).

Simply put, plaintiff has not shown he was "aggrieved" in any way as a result of the assignment of sugar-loss monitoring to Lab Techs. Banks v. General Motors, LLC, 81 F.4th at 270. He contends that, by being required to perform sugar-loss monitoring tasks in addition to his regular Lab Tech tasks, he effectively performed the work of a Senior Tech without receiving the commensurate higher hourly wage. But plaintiff benefitted financially from the assignment of sugar-loss monitoring tasks; after all, this policy caused him to earn overtime at a higher rate than he otherwise would have earned as a Lab Tech, and it did not materially worsen his working conditions. And he has not presented evidence that the assignment of tasks with a corresponding increase in compensation is adverse simply based on the fact that, if plaintiff had his desired job, he would have earned even more. Thus, this case is distinguishable from adverse employment actions like the assignment of additional work without increased compensation. See McDowell v. McDonough, 2022 WL 18539464, at *2 (W.D.N.Y. Dec. 21, 2022), report and recommendation adopted, 2023 WL 1421580 (W.D.N.Y. Jan. 31, 2023) (finding that the alleged increased workload without appropriate compensation properly stated an adverse employment action).

Plaintiff's initial refusal to perform sugar-loss monitoring work without a promotion to Senior Tech is insufficient to create an adverse employment action. "A plaintiff's subjective dissatisfaction with the work assigned, absent some evidence that the assignment materially worsened h[is] working conditions, is insufficient to make out an adverse employment action." Jean-Pierre v. Citizen Watch Co. of Am., Inc., 2019 WL 5887479, at *7 (S.D.N.Y. Nov. 12, 2019). Here, plaintiff cannot identify a material deterioration in his working conditions beyond

his frustration at not being promoted to Senior Tech—a role for which there were no openings.

See id. (identifying potential material deteriorations in working conditions, including "a demotion evidenced by a decrease in wage or salary, a less distinguished title, or a material loss of benefits").

Nor is the Court persuaded that the assignment of sugar-loss monitoring tasks without a commensurate promotion to Senior Tech harmed plaintiff because he lost the prestige of the Senior Tech position.  In support of this argument, plaintiff cites Muldrow v. City of St. Louis, 601 U.S. at 359, but that case is distinguishable.  In Muldrow, the employer transferred the plaintiff police sergeant "from a plainclothes job in a prestigious specialized division giving her substantial responsibility over priority investigations" to a "uniformed job supervising one district's patrol officers, in which she . . . primarily performed administrative work" and was required to "work weekends" without the benefit of a "take-home car."  Id.  That loss of prestige, coupled with objectively worse working conditions, is not analogous to the situation here. Plaintiff was not transferred to a different work setting or role, ASR did not remove workplace benefits from his position, and he did not lose prestige that he previously enjoyed.  Muldrow is inapposite.

Accordingly, plaintiff has failed to satisfy even the "minimal" burden of putting forth a prima facie case that the assignment of sugar-loss monitoring tasks constituted discrimination. Norton v. Sam's Club, 145 F.3d at 118.

 C.  Failure to Promote Claim

  1. Prima Facie Case

To establish a prima facie case of discriminatory failure to promote, a plaintiff must show (i) he is a member of a protected class, (ii) he applied and was qualified for a job for which the

employer was seeking applicants, (iii) he was rejected for the position, and (iv) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.  Reyes v. City Practice Grp. of New York, LLC, 2025 WL 388524, at *16 (S.D.N.Y. Feb. 4, 2025).  "To satisfy the application piece of the second prong, a formal job application may not be required if the employee can demonstrate that (i) the vacancy at issue was not posted, and (ii) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  Id.

Plaintiff falters on the second prong.  It is undisputed that, after Gewan resigned from the Senior Tech role in May 2019, ASR neither posted an opening for that position nor attempted to fill it.  Instead, ASR hired another employee to join the Lab as a Lab Tech.  There is some dispute in the factual record as to whether Baum, the then-Quality Manager, had the authority to formally eliminate the third Senior Tech position in May 2019, but that is not material here.  The dispositive question is whether ASR continued to seek applicants having plaintiff's qualifications after denying plaintiff the Senior Tech role.  Reyes v. City Practice Grp. of New York, LLC, 2025 WL 388524, at *16.  That did not happen.

Plaintiff cannot point to any facts that could lead a reasonable jury to believe that ASR kept the third Senior Tech position open.  Although an ASR supervisor did instruct Angone to train plaintiff for the third Senior Tech position around the time of Gewan's departure, there is no evidence in the record that the company continued training plaintiff or anyone else once Baum decided to shutter the role.  As for Angone's comment in spring 2020 that plaintiff had refused a promotion, there is no evidence in the record showing that ASR actually offered a Senior Tech promotion to plaintiff or subsequently attempted to fill that position with other candidates.  Finally, Baum's and Angone's comments to Forrester that plaintiff was not "promotable" do not

change this analysis.  (Doc. #85-3 at ¶ 3).  Forrester joined the Lab in 2020—after Baum made the decision to not hire a third Senior Tech—and the record does not show that Baum and Angone made these comments to Forrester while discussing reopening the position.  Thus, their remarks might be probative of potential pretext, but they do not help plaintiff establish a <u>prima facie</u> case in the first place.

      Ultimately, it is undisputed that ASR (functionally, if not officially) phased out the third Senior Tech position after Gewan's departure and chose to staff the Lab by hiring another Lab Tech and spreading Senior Tech responsibilities across Lab Techs when appropriate.  Crucially, ASR never reopened that position.  As such, ASR did not commit the gravamen of a failure to promote claim:  it never passed over plaintiff for a position that it <u>then attempted to fill</u> with other, equally qualified candidates.

      Plaintiff argues ASR's de facto elimination of the third Senior Tech position creates a "unique wrinkle" warranting the denial of summary judgment, because the company did so to discriminate against him and avoid hiring him.  (Doc. #85 at 6).  But plaintiff himself admits that Baum—the ASR employee who decided not to fill the third Senior Tech position after Gewan's departure—did not discriminate against him.  Instead, he maintains that Angone's racist "reputation[] at ASR" creates an issue of fact as to the legitimacy of ASR's elimination of the third Senior Tech position.  (<u>Id</u>. at 7).   But Angone's racially insensitive remarks do not create a triable issue of fact on a failure to promote claim, as he was not the decisionmaker responsible for either filling or functionally eliminating the third Senior Tech role.   <u>Wheeler v. Praxair Surface Techs., Inc.</u>, 694 F. Supp. 3d 432, 458 (S.D.N.Y. 2023).  As such, plaintiff "has not come forward with non-speculative evidence that [ASR's] decision not to promote him was based on his being Black."  <u>Id</u>. at 457.

Moreover, plaintiff points to no authority—nor is the Court aware of any—for the proposition that an employer's decision to eliminate a position circumvents the requirement that a plaintiff must show the position remained open and the employer continued to seek applicants with plaintiff's qualifications.  Indeed, in <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 228 (2d Cir. 2004), the Second Circuit found the plaintiff could not sustain a failure to promote claim because she could not produce "evidence of any . . . vacancies" after a business decision by the company "eliminated the need" for the position the plaintiff wanted to obtain.  <u>See also</u> <u>Wheeler v. Praxair Surface Techs., Inc.</u>, 694 F. Supp. 3d at 458 (granting summary judgment on plaintiff's failure to promote claim because, in part, "the post [plaintiff] sought was never filled and eventually eliminated").  ASR's ongoing use of Lab Techs to perform some tasks also performed by Senior Techs does not change this analysis.  As in <u>Petrosino</u>, ASR made a personnel decision that eliminated the need for one position by reallocating duties to others—here, by hiring another Lab Tech in lieu of a Senior Tech and reassigning certain responsibilities when necessary.

Plaintiff's speculation regarding ASR's motive for eliminating the third Senior Tech position does not create a material question of fact necessary to survive summary judgment. Therefore, he cannot make a <u>prima facie</u> showing of discriminatory failure to promote.

III.    <u>Retaliation Claims</u>

Defendants argue plaintiff fails to point to any evidence creating a triable issue of fact regarding his retaliation claims under Title VII, Section 1981, or the NYSHRL.

The Court agrees.

A.    <u>Legal Standard</u>

Plaintiff's retaliation claims under Title VII, Section 1981, and the NYSHRL are also governed by the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>Alvarado v. United</u>

Hospice, Inc., 631 F. Supp. 3d 89, 116 (S.D.N.Y. 2022) (collecting cases).  To make out a prima facie case of retaliation under Title VII, Section 1981, and the NYSHRL, a plaintiff must show he (i) "engaged in protected activity," (ii) "the defendant was aware of that activity," (iii) he "was subjected to a retaliatory action" that was "materially adverse," and (iv) "there was a causal connection between the protected activity and the materially adverse action."  Carr v. N.Y.C. Transit Auth., 76 F.4th 172, 180 (2d Cir. 2023); Said v. NYC Health & Hosp. Corp., 2024 WL 1769317, at *3 (E.D.N.Y. Apr. 24, 2024) (listing elements of a prima facie case under the NYSHRL as "similar [in] form to Title VII").[4]

A "protected activity" entails "action taken to protest or oppose statutorily prohibited discrimination."  Jarrell v. Hosp. for Special Care, 626 F. App'x 308, 311 (2d Cir. 2015) (summary order).  Therefore, complaints of unfair treatment or "generalized grievances about an unpleasant or even harsh work environment, without more . . . fail to rise to the level of protected activity."  Green v. Mount Sinai Health Sys., Inc., 826 F. App'x 124, 125 (2d Cir. 2020) (summary order).  "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class."  Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009).

---

[4]    Although previously the same standard applied to Title VII and NYSHRL retaliation claims, in 2019, the NYSHRL was amended to relax the standard for retaliation claims.  Everett v. N.Y.C Dep't of Educ., 2023 WL 5629295, at *14 (S.D.N.Y. Aug. 31, 2023).  "While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, courts in this District have interpreted the amendment as rendering the standard for claims closer to the [broader] standard of the" New York City Human Rights Law ("NYCHRL").  Kaye v. N.Y.C. Health & Hosps. Corp., 2023 WL 2745556, at *17 (S.D.N.Y. Mar. 31, 2023).  The Court "need not resolve the impact of these amendments here" because plaintiff's "claims fall short even under the NYCHRL's more liberal standards."  Cooper v. Franklin Templeton Invs., 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (summary order).

To establish a materially adverse employment action for purposes of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

For purposes of a retaliation claim, causation can be established: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d. Cir 2000). Moreover, the plaintiff must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). Thus, Title VII, Section 1981, and NYSHRL retaliation claims all require evidence that the desire to retaliate was the "but-for cause" of the materially adverse action. See Gordon-Mallet v. Mt. Sinai Hosps. Grp., Inc., 2024 WL 1513910, at *18 (S.D.N.Y. Apr. 8, 2024) (applying but-for causation standard to retaliation claims under Title VII, Section 1981, and the NYSHRL).

Temporal proximity between the adverse action and the protected activity may, on its own, be sufficient to establish a prima facie element of causation. Parron v. Herbert, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order). Causation may also be established by showing that "the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to encouragement by a superior (who has knowledge) to disfavor the plaintiff." Summa v. Hofstra Univ., 708 F.3d 115, 127 (2d Cir. 2013).

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." Summa v. Hofstra Univ., 708 F.3d at 125. "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Id.

B.    Analysis

Here, plaintiff predicates his retaliation claims on six supposed materially adverse employment actions:  (i) scrutiny of his paperwork by Angone and Tappan Dutta, an ASR employee who left the Lab in 2011; (ii) the 2019 assignment of sugar-loss monitoring tasks to Lab Techs according to staffing needs; (iii) the 2019 denial of his requested promotion to Senior Tech; (iv) the 2020 decision to train all Lab Techs on sugar-loss monitoring issues; (v) the September 2020 denial of plaintiff's requested promotion to Senior Tech; and (vi) Angone's continued hostility after plaintiff submitted his 2019 and 2020 grievances.

All but one of these allegedly adverse employment actions cannot sustain a prima facie case of retaliation.  First, several of these employment actions—specifically, the 2011 scrutiny of plaintiff's paperwork by Dutta, the 2019 assignment of sugar-loss monitoring tasks to Lab Techs, and the 2019 denial of plaintiff's requested promotion to Senior Tech—all occurred before plaintiff's first complaint:  the August 2019 grievance.  As such, plaintiff cannot establish a causal connection between the protected activity and the adverse employment actions.  Owens v. City of N.Y. Dep't of Educ., 2021 WL 3862974, at *16 (S.D.N.Y. Aug. 30, 2021).

Second, on a related note, plaintiff contends Angone created a retaliatory hostile work environment after plaintiff filed the August 2019 grievance, but he also contends Angone created

a hostile work environment <u>before</u> that grievance as well.  "To establish a causal connection between the protected activity and the hostile work environment, some increase in the discrimination or harassment—either a ratcheting up of the preexisting behavior, or new, additional forms of harassment—must occur for the employee to make out a viable retaliation claim."  <u>Molina v. John Jay Inst. For Justice & Opportunity/City Univ. of N.Y.</u>, 2024 WL 4276913, at *11 (S.D.N.Y. Sept. 24, 2024).   In an affidavit filed in support of his opposition to defendants' motion for summary judgment, plaintiff asserts Angone "increased" his hostile treatment of plaintiff beginning in May 2020, including by becoming "furious when Plaintiff left his desk for a minute, refusing to speak with plaintiff, and "repeatedly" concealing overtime opportunities from plaintiff until "the last minute" so plaintiff could not claim them.  (Garrison Decl. at ¶¶ 46–47).  But plaintiff's affidavit contradicts his deposition testimony; when testifying about the retaliation he experienced, he did not allege that Angone increased his hostile conduct in May 2020, nor did he list the specific behaviors referenced in the affidavit.  Plaintiff cannot defeat summary judgment by relying on a new affidavit that contradicts his previous deposition testimony.  <u>Moll v. Telesector Res. Grp., Inc.</u>, 760 F.3d 198, 205 (2d Cir. 2014).   Thus, because plaintiff has produced no evidence showing "a ratcheting up" of Angone's conduct after the August 2019 complaint, he cannot make a <u>prima facie</u> showing of a claim of retaliatory hostile work environment as to Angone's behavior.  <u>Molina v. John Jay Inst. For Justice & Opportunity/City Univ. of N.Y.</u>, 2024 WL 4276913, at *11.

Third, the decision to train all Lab Techs on sugar-loss monitoring, and then to assign them those tasks when necessary, is not an adverse employment action.  Although the standard for determining an adverse employment action is lower in the retaliation context than in the discrimination context, <u>see</u> <u>Carr v. N.Y.C. Transit Auth.</u>, 76 F.4th at 179, the training and

assignment of sugar-loss monitoring to Lab Techs is not an adverse employment action for purposes of plaintiff's retaliation claim as well as his discrimination claim. Plaintiff was not disciplined, transferred to a new position, or placed in materially worse working conditions. The training and assignment of sugar-loss monitoring tasks to Lab Techs was a policy implemented by ASR that applied equally to all Lab Techs. "[A]bsent allegations of more direct hostile conduct, a reasonable employee would not be dissuaded from taking protected action simply because they are subject to the same policies as other employees." Id. at 180.

That leaves only the September 2020 decision to not create a third Senior Tech role, and thus deny plaintiff's requested promotion to Senior Tech. Unlike the other supposed instances of retaliation, plaintiff has put forth a prima facie case of retaliation as to this adverse action. Ordinarily, Mendonca's undisputed lack of knowledge of plaintiff's grievances would "doom [plaintiff's] ability to show . . . causation." EEOC v. Bloomberg L.P., 967 F. Supp. 2d 816, 859 (S.D.N.Y. 2013). But here, plaintiff has raised an inference that Mendonca's decision to not reinstate the third Senior Tech position was influenced by Angone, who knew of plaintiff's grievances and expressed animosity toward him. Although Mendonca testified that, during the September 2, 2020, meeting to discuss the Senior Tech position, Angone spoke in favor of creating the position, Forrester affirmed in his declaration that, during the spring and summer of 2020, Angone repeatedly voiced his opposition to promoting plaintiff to Senior Tech. Because Mendonca included Angone in the September 2, 2020, meeting, and a reasonable jury could infer from the evidence that Angone opposed plaintiff's promotion in that meeting or in separate conversations with other ASR employees who spoke to Mendonca, plaintiff has made a prima facie showing of causation. Summa v. Hofstra Univ., 708 F.3d at 127.

Turning to the next step of the <u>McDonnell-Douglas</u> analysis, Mendonca asserted that she decided not to revive the third Senior Tech because she was convinced there was no business need to do so, especially in light of the Lab's already high overtime costs. As such, defendants have proffered a legitimate, non-retaliatory justification for the decision not to create the third Senior Tech position.

Plaintiff's retaliation claim falters on the third <u>McDonnell-Douglas</u> step: he cannot point to evidence that would be sufficient to permit a rational factfinder to conclude that defendants relied on a pretextual reason in refusing to reestablish the third Senior Tech slot. In fact, plaintiff does not even attempt to argue Mendonca's stated reason was pretextual. Instead, he contests the underlying logic of her rationale by contending a third Senior Tech role would have had no impact on the amount of overtime incurred at the Lab. But an employee's dispute as to the soundness of an employer's non-retaliatory business decision does not create a genuine dispute of material fact. "[T]he key issue is what motivated" an employer's decision, not whether the non-discriminatory justification for that decision was accurate. <u>James v. Port Authority Police Dep't</u>, 2025 WL 966016, at *24 (S.D.N.Y. Mar. 31, 2025). Therefore, plaintiff's "disagreement on the facts" regarding the Lab's overtime costs "misses the point." <u>Id</u>.[5] Because plaintiff has put forth no evidence suggesting Mendonca's stated business reason for not reviving the third Senior Tech position was pretext for discrimination, summary judgment is appropriate as to

---

[5] A plaintiff's factual disagreement with the rationale for an employer's non-discriminatory decision typically arises in the context of disciplinary actions. <u>See, e.g.</u>, <u>Vasquez v. Empress Ambulance Serv., Inc.</u>, 835 F.3d 267, 275 (2d Cir. 2016) ("[W]hen considering the legitimacy of an employer's reason for an employment action, we look to what motivated the employer rather than to the truth of the allegations against the plaintiff on which it relies."). Here, ASR's decision to not fill the third Senior Tech position had nothing to do with plaintiff's performance and instead was related to broader staffing and financial concerns. As such, plaintiff's challenge to the factual basis for that decision is even less persuasive than a factual challenge to an employment action taken against him.

plaintiff's retaliation claim arising from the denial of his requested promotion in September 2020.

IV.    Hostile Work Environment Claim

Defendant argues that plaintiff's hostile work environment claim under the NYSHRL fails because plaintiff's alleged evidence shows nothing more than petty slights.[6]

The Court agrees.

A.    Legal Standard

To state a hostile work environment claim under the NYSHRL, a plaintiff must establish that he was "subjected to inferior terms, conditions, or privileges of employment because of [his] membership in one or more protected categories."  Totorici v. Bus-Tev, LLC, 2021 WL 4177209, at *13 (S.D.N.Y. Sept. 13, 2021).  However, a claim for hostile work environment under the NYSHRL will not succeed if the offending actions are "nothing more than petty slights or trivial inconveniences."  Magnoni v. Smith Laquercia, LLP, 701 F. Supp. 2d 497, 505 (S.D.N.Y. 2010).

B.    Analysis

Before reaching the merits of this claim, the Court must address two threshold issues raised by the parties.

First, under the continuing violation doctrine, the Court can consider events that occurred prior to October 11, 2019,[7] when evaluating plaintiff' hostile work environment claim.  Under that doctrine, "otherwise time-barred discrete acts are considered timely where specific and

---

[6]    The Court previously granted defendants' motion to dismiss plaintiff's Title VII and Section 1981 hostile work environment claims, allowing only plaintiff's NYSHRL hostile work environment claim to proceed to summary judgment.  (Doc. #38).

[7]    The "inferior terms, conditions, or privileges of employment" standard for proving a hostile work environment claim under New York State law went into effect on October 11, 2019. See Arazi v. Cohen Bros. Realty Corp., 2022 WL 912940, at *7 (S.D.N.Y. Mar. 28, 2022).

related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  Munjal v. Emirates, 2022 WL 204775, at *6 (S.D.N.Y. Jan. 24, 2022).[8]  Defendants argue that the continuing violation doctrine does not apply when the "incidents are unrelated and significant gaps in time break the asserted continuum of discrimination."  (Doc. #86 at 8).  To be sure, defendants are correct that unrelated, temporally distinct factual allegations do not fall under the continuing violation doctrine. McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 78 (2d Cir. 2010).  Here, however, plaintiff's allegations on this claim all relate to comments and actions taken by Angone—not by multiple different supervisors or coworkers across separate departments, as is often the case when courts find that the continuing violation doctrine does not apply.  See Newton v. LVMH Moet Hennessy Louis Vuitton Inc., 746 F. Supp. 3d 135, 154 (S.D.N.Y. 2024).  And, unlike cases where courts reject the continuing violation doctrine, Angone's alleged actions are not separated by intervening actions taken by ASR in response to complaints raised by plaintiff.  See Kocar v. Port Auth. of N.Y. and N.J., 2022 WL 624070, at *5–6 (S.D.N.Y. Mar. 2, 2022).

Second, the Court cannot consider some of plaintiff's proffered evidence on this claim because it is inadmissible.  "In assessing motions for summary judgment, courts may consider only evidence that would be admissible at trial."  Brown v. Montefiore Med. Ctr., 2024 WL 1367974, at *8 (S.D.N.Y. Mar. 31, 2024).  Inadmissible evidence, such as hearsay that is not otherwise admissible pursuant to the Federal Rules of Evidence, "is insufficient to create a genuine issue of fact, absent a showing that admissible evidence will be available at trial."  Id. In support of his hostile work environment claim, plaintiff offers multiple instances of

---

[8]     This formulation of the continuing violation doctrine is specific to NYSHRL claims.  See Munjal v. Emirates, 2022 WL 204775, at *6.

inadmissible hearsay, such as statements in which coworkers informed plaintiff and another ASR employee, Andrea Stephens, that Angone was racist.  Because these statements would not be admissible at trial, the Court cannot consider them in deciding defendants' motion for summary judgment.  Id.  Plaintiff does not contest that these statements are inadmissible hearsay, nor does he otherwise attempt to show that admissible evidence regarding these allegations will be available at trial.

Other evidence that plaintiff proffers is inadmissible for different reasons.  For instance, in his affidavit, plaintiff asserts that Angone once called him "boy."  (Garrison Decl. at ¶ 32).  Yet that assertion contradicts plaintiff's prior testimony, when he was asked to list all of the racially discriminatory comments Angone made in his presence and did not mention the "boy" incident.  Again, plaintiff cannot defeat summary judgment by relying on a new affidavit that contradicts his previous deposition testimony.  Moll v. Telesector Res. Grp., Inc., 760 F.3d at 205.

Thus, when considering plaintiff's hostile work environment claim, the Court may, and will, consider evidence of pre-October 11, 2019, incidents as part of a continuing violation, but it will not consider statements that would be inadmissible at trial or statements introduced through an affidavit that contradicts a party's testimony.

Having reviewed that factual universe as a whole, and having drawn all reasonable inferences in plaintiff's favor, the Court determines that plaintiff's hostile work environment claim cannot survive summary judgment.  The admissible evidence here includes:  the comment Angone made to plaintiff and another ASR employee in which Angone stated "I have so much work to do today I feel like a slave" (Doc. 78-1 at Tr. 198); the incident in which Angone directed plaintiff and another African American employee to lift heavy objects and, in response to their complaints, asked "[W]hat are you complaining about.  You know you people are strong"

26

(Id. at Tr. 301); Angone's description of Black Lives Matter protestors as "low lives" (Id. at Tr. 302); Angone's criticism of plaintiff's work to other Lab employees, including calling plaintiff "lazy" (Doc. #78-1 at Tr. 79; Doc. #78-2 at Tr. 20); Angone's assignment of additional work to plaintiff; and Angone's frequent refusal to speak with plaintiff or answer his questions.

Plaintiff's evidence does not create a triable factual dispute as to the existence of a hostile work environment.  Defendants argue that Angone's "slave" and "you people are strong" comments are facially neutral but, even assuming they were racially tinged, those comments do not rise beyond the level of "petty slights or trivial inconveniences." Magnoni v. Smith Laquercia, LLP, 701 F. Supp. 2d at 505.  Statements that are "unwelcome and upsetting" do not create a hostile work environment if they "do not reflect obvious discrimination or speak to Plaintiff's standing in the workplace."  Maynard v. Montefiore Med. Ctr., 2021 WL 396700, at *15 (S.D.N.Y. Feb. 4, 2021).  Angone's use of the word "slave" in reference to himself, not plaintiff, has nothing to do with plaintiff's "standing in the workplace."  Id.  The same goes for Angone's discussion of the Black Lives Matter protests.  Similarly, Angone telling other Lab employees that plaintiff was "lazy" also is no more than a petty slight.  Inman v. City of New York, 2011 WL 4344015, at *7 (Sept. 13, 2011).  Although labeling a racial minority as "lazy" can be an actionable form of hostile work environment, courts typically reach that conclusion when the word is paired with objectively more offensive language.  See Philip v. Gtech Corp., 2016 WL 3959729, at *25 (S.D.N.Y. July 20, 2016) (finding that a supervisor's use of the term "lazy n*****", along with "other, secondhand evidence of racial bias," was more than just a petty slight); Wheeler v. Praxair Surface Techs., Inc., 694 F. Supp. 3d at 454 (finding that a supervisor's statement that "Black people are lazy and do not work hard," along with other racially offensive language, surpassed the barrier of petty slights).

As for Angone's "you people are strong" comment, "[s]tanding alone . . . this statement does not indicate that [plaintiff] was treated any less well than [his] colleagues."  Grewal v. Cuneo Gilbert & LaDuca LLP, 2017 WL 1215752, at *15 (S.D.N.Y. Mar. 31, 2017).  Plaintiff did not, for example, adduce evidence that Angone asked only African American employees to lift heavy objects.  Id.

The remaining evidence—Angone's assignment of additional work to plaintiff and his refusal to speak with plaintiff—shows nothing more than incivility and personality conflicts, which do not create a hostile work environment.  Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 678 (S.D.N.Y. 2012).

Even when considering the cumulative effect of these incidents, plaintiff has not demonstrated a triable question of fact as to the existence of a hostile work environment.  Plaintiff has put forth evidence of a handful "[i]solated incidents of unwelcome verbal conduct." Alexander v. Possible Productions, Inc., 336 F. Supp. 3d 187, 195 (S.D.N.Y. 2018).  Isolated comments can create a cause of action under the NYSHRL, but they must be more than petty slights or inconveniences.  Modica v. N.Y.C. Dep't of Educ., 2021 WL 3408587, at *7 (S.D.N.Y. Aug. 4, 2021).  Instead, such commentary must be objectively discriminatory or demean the status of plaintiff's protected class in a professional setting.  Maynard v. Montefiore Med. Ctr., 2021 WL 396700, at *15.  Here, plaintiff has "failed to produce evidence to create a question of fact as to whether [he] was subjected to a hostile work environment because of [his] protected characteristics."  Marseille v. Mount Sinai Health Sys., Inc., 2021 WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021).  Cf. Wheeler v. Praxair Surface Techs., Inc., 694 F. Supp. 3d at 454–55 (denying summary judgment on NYSHRL hostile work environment claim because "much of the

commentary at issue overtly referenced race" and "demean[ed] [the employer's] Black employees as unworthy of the workplace on account of race").

Accordingly, plaintiff cannot defeat summary judgment on his NYSHRL hostile work environment claim.

V.    NYEPA Unequal Pay Claim

Defendants argue plaintiff's NYEPA unequal pay claim fails because plaintiff's compensation was equal to that of his actual peers.

The Court agrees.

A.    Legal Standard

To establish a NYEPA violation, a plaintiff must show (i) the employer pays different wages to individuals who are not members of the plaintiff's protected class (or classes), (ii) "the employees perform equal work on jobs requiring equal skill, effort, and responsibility," and (iii) "the jobs are performed under similar working conditions." Eisenhauer v. Culinary Inst. Of Am., 84 F.4th 507, 523 (2d Cir. 2023). "Critical to these claims are the equal work inquiry, which requires evidence that the jobs compared are substantially equal." Woods-Early v. Corning Inc., 2023 WL 4598358, at *4 (W.D.N.Y. July 18, 2023).

B.    Analysis

The parties dispute whether plaintiff's proposed comparators, Senior Techs Johnson and Jabbi, are members of his protected class, but even assuming they are not, plaintiff has not shown that he and the two Senior Techs perform equal work.  Plaintiff does not dispute that:  (i) Johnson and Jabbi are more senior than he is; (ii) they underwent training on instrument calibrations, chemical titrations, and microbiology that he has not received; and (iii) unlike Johnson and Jabbi, plaintiff has never performed work related to those specific responsibilities.  A difference in

training and assigned duties is a significant indication that individuals do not perform equal work.  Black v. Buffalo Meat Service., Inc., 2022 WL 2902693, at *4 (2d Cir. July 22, 2022).

Plaintiff rests his equal pay argument on the fact that he, Johnson, and Jabbi perform some of the same tasks, but "it is not enough to point out that some work duties overlap"; when considering a plaintiff's NYEPA claim, courts must examine "the myriad factors, such as education, training, job requirements, job responsibilities, hours worked, and similar working conditions" that form the relevant analysis.  Woods-Early v. Corning Inc., 2023 WL 4598358, at *6.  The relevant factors here—training, job requirements, and experience or seniority—demonstrate that plaintiff has "not shown that [his] job and [Johnson and Jabbi's jobs] demanded equal work" as defined under NYEPA.  Edelman v. NYU Langone Health Sys., 708 F. Supp. 3d 409, 431 (S.D.N.Y. 2023).

VI.    NYSHRL Aiding and Abetting Claim

Because the Court concludes plaintiff was not discriminated against based on his race or retaliated against based on his actions, there can be no claim that Angone aided and abetted such unlawful conduct.

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #75) and close this case.

Dated:  June 25, 2025
        White Plains, NY

                        SO ORDERED:

                        _____
                        Vincent L. Briccetti
                        United States District Judge